Slip Op. 19-109

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **TMB 440AE, INC. (FORMERLY KNOWN AS ADVANCE ENGINEERING CORPORATION),** <br>        Plaintiff, <br><br>        v. <br><br> **UNITED STATES,** <br><br>        Defendant. | Before: Jane A. Restani, Judge <br><br> Court No. 18-00095 <br><br> PUBLIC VERSION |

## OPINION

[Commerce's final scope ruling is remanded to consider (k)(1) sources in assessing whether certain pipe is within the scope of antidumping duty and countervailing duty orders.]

Dated: August 13, 2019

Ned H. Marshak, David M. Murphy, and Jordan C. Kahn, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY and Washington D.C., and Dale E. Stackhouse and Meghann C. T. Supino, Ice Miller LLP, of Indianapolis, IN for Plaintiff TMB 440AE, Inc.

Elizabeth A. Speck, Senior Trial Counsel, and Patricia M. McCarthy, Civil Division, U.S. Department of Justice, of Washington D.C., for the defendant. With them on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Assistant Director. Of counsel on the brief was Jessica R. Di Pietro, Attorney, U.S. Department of Commerce, of Washington, D.C.

  Restani, Judge: This action challenges a final scope ruling issued by the United States Department of Commerce, International Trade Administration ("Commerce") regarding seamless pipe imported by TMB 440AE, Inc. (formerly known as Advance Engineering Corporation), ("AEC").[1] AEC moves for judgment on the administrative record and asks the court to hold that Commerce's final scope ruling, finding that AEC's seamless pipe ("AEC

---

[1] Because the parties refer to plaintiff under its former name, the court follows suit.

pipe") is within the scope of the antidumping and countervailing duty orders on certain seamless carbon and alloy steel pipe from the People's Republic of China ("PRC"), is unsupported by substantial evidence or otherwise not in accordance with law. See Mem. L. Supp. Pl. Mot. J. Agency Record, ECF No. 21 at 19–22 (Oct. 22, 2018) ("AEC Br.").

AEC contests Commerce's finding that the language of the relevant antidumping and countervailing duty orders was unambiguous and claims Commerce erred in failing to consider certain criteria required by its regulations governing scope rulings. If the court sustains the Final Scope Ruling, AEC alternatively claims that Commerce acted unlawfully in instructing the U.S. Customs and Border Protection ("Customs") to assess antidumping and countervailing duties on AEC pipe entries made prior to the publishing of the final scope ruling. Defendant United States opposes Plaintiff's motion.

For the following reasons, the court remands Commerce's final scope determination for reconsideration. Pending the resolution of the remand, the court defers consideration of AEC's alternative claims regarding Commerce's liquidation instructions.

## BACKGROUND

In 2010, Commerce published antidumping duty and countervailing duty orders on certain seamless pipe from the PRC. See Amended Antidumping Duty Order: Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China, 75 Fed. Reg. 69,052-01 (Dep't Commerce Nov. 10, 2010) ("ADD Order"); Amended Countervailing Duty Order: Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China, 75 Fed. Reg. 69,050-01 (Dep't Commerce Nov. 10, 2010) ("CVD Order") (collectively, the "Orders"). The Orders cover merchandise under several headings of the Harmonized Tariff Schedule of the United States ("HTSUS"),

including subheadings 7304.39.0020 and 7304.39.0024,[2] under which the AEC pipe at issue fall. See ADD Order, 75 Fed. Reg. at 69,053; CVD Order, 75 Fed. Reg. at 69,051; AEC Br. at 9. The Orders, however, exclude the following:

> (1) All pipes meeting aerospace, hydraulic, and bearing tubing specifications; (2) all pipes meeting the chemical requirements of ASTM A-335, whether finished or unfinished; and (3) unattached couplings. Also excluded from the scope of the order are all mechanical, boiler, condenser and heat exchange tubing, except when such products conform to the dimensional requirements, i.e., outside diameter and wall thickness of ASTM A-53, ASTM A-106 or API 5L specifications.

ADD Order, 75 Fed. Reg. at 69,052–53; CVD Order, 75 Fed. Reg. at 69,051.

AEC requested that Commerce issue a scope ruling finding that its pipe was excluded from the scope of the Orders as pipes meeting aerospace specifications. See Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China: Advance Engineering Scope Request: Specialized Seamless Pipe, ECF No. 29 (Oct. 20, 2017)

---

[2] Although the HTSUS subheadings are "provided for convenience and customs purposes, [the] written description of the merchandise subject to this scope is dispositive." ADD Order, 75 Fed. Reg. at 69,053; CVD Order, 75 Fed. Reg. at 69,051. The description in the Orders are:

> The merchandise covered by this order is certain seamless carbon and alloy steel (other than stainless steel) pipes and redraw hollows, less than or equal to 16 inches (406.4 mm) in outside diameter, regardless of wall-thickness, manufacturing process (e.g., hot-finished or cold-drawn), end finish (e.g., plain end, beveled end, upset end, threaded, or threaded and coupled), or surface finish (e.g., bare, lacquered or coated). Redraw hollows are any unfinished carbon or alloy steel (other than stainless steel) pipe or "hollow profiles" suitable for cold finishing operations, such as cold drawing, to meet the American Society for Testing and Materials ("ASTM") or American Petroleum Institutes ("API") specifications referenced below, or seamless carbon and alloy steel (other than stainless steel) standard, line, and pressure pipes produced to the ASTM A-53, ASTM A-106, ASTM A-334, ASTM A-589, ASTM A-795, ASTM A-1024, and the API 5L specifications, or comparable specifications, and meeting the physical parameters described above, regardless of application[.]

("Scope Ruling Request"). Commerce subsequently issued a determination finding that AEC pipe was within the scope of the Orders and that it did not fall within any exclusion. Antidumping and Countervailing Duty Orders on Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China: Final Scope Ruling for Advance Engineering; Specialized Seamless Pipe, ECF No. 18-1 at 7–8 (Mar. 29, 2018) ("Final Scope Ruling"). Commerce found "the plain language [of the Orders] to be dispositive" and accordingly did not conduct an analysis under 19 C.F.R. § 351.225(k). Id. at 7. AEC appeals that determination to the court.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2012). The court has authority to review Commerce's decision that merchandise falls within an antidumping or countervailing duty order. 19 U.S.C. § 1516a(a)(2)(B)(vi). Commerce's final scope determination will be upheld unless "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I. Legal Framework

After an antidumping or countervailing duty order is published, importers can request that Commerce clarify the scope of the order. See 19 C.F.R. § 351.225(a), (c) (2016). There is no statutory provision setting forth procedures for interpreting the scope of an order. Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States, 776 F.3d 1351, 1353 (Fed. Cir. 2015). Accordingly, Commerce has published regulations that outline the necessary steps for assessing whether a product is included within the scope of an order. See 19 C.F.R. § 351.225.

Commerce must consider "[t]he descriptions of the merchandise contained in the petition,

the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission." 19 C.F.R. § 351.225(k)(1). If these "(k)(1) sources" are dispositive, Commerce can end its inquiry and issue a final ruling. <u>Tak Fat Trading Co. v. United States</u>, 396 F.3d 1378, 1382 (Fed. Cir. 2005). If not, Commerce must conduct a formal scope inquiry and consider "(k)(2) factors," which are "(i) [t]he physical characteristics of the product; (ii) [t]he expectations of the ultimate purchasers; (iii) [t]he ultimate use of the product; (iv) [t]he channels of trade in which the product is sold; and (v) [t]he manner in which the product is advertised and displayed." 19 C.F.R. § 352.225(k)(2); 19 C.F.R. § 352.225(e). Although Commerce is owed "significant deference" with regard to its interpretation of its orders, Commerce cannot issue an interpretation that changes the scope of the order nor "interpret an order in a manner contrary to its terms." See <u>Duferco Steel Inc. v. United States</u>, 296 F.3d 1087, 1094–95 (Fed. Cir. 2002).

    **II.**    **The AEC Pipe at Issue in the Scope Ruling Request**

In the Scope Ruling Request, AEC describes its pipe as servicing a "niche market" that requires more exacting specifications than "[p]ipes meeting the general industry standard, ASTM A-53." Scope Ruling Request at 3. For instance, the Scope Ruling Request describes AEC pipe as having [[

]] to satisfy the more exacting requirements for residential gas utility use. <u>Id.</u> at 4–7. The "tight specifications that AEC has designed for the imported AEC pipe ensure that the pipe can be easily threaded" so as to conform with the SAE Aerospace Standard which AEC states is "critical" to its business as AEC would otherwise "not be able to

meet its customers' unique needs." Id. at 6.[3] AEC states that this specialization renders its pipes more akin to [[          ]], which is explicitly excluded from the Orders, than standard "commodity" pipe. Id. at 7–8. AEC claims that no domestic source exists that satisfies its specialized requirements. Id. at 8–10.

Further, in the Scope Ruling Request, AEC notes that despite having imported the pipe at issue since 2006, neither it nor its Chinese vendor were named in the petition as importers or producers of seamless pipe. Id. at 10–11. AEC argues that "[d]ue to the highly specialized base product" AEC pipe does not [[

]] Id. at 13. Finally, as noted below, AEC cites evidence from the investigation, petition, and ITC Final Report that it claims support a finding that AEC pipe should be excluded from the Orders. Id. at 21–29.

### III.   Commerce Did Not Act in Accordance with its Regulation in Assessing Whether AEC Pipe is Subject Merchandise Under the Orders.

Commerce found that the language of the Orders was unambiguous and decided not to consider the criteria of 19 C.F.R. § 351.225(k)(1). Final Scope Ruling at 7–8. It found that the AEC pipe at importation "meets the written description of the merchandise subject to the Orders," and additionally falls within the HTSUS subheadings specified. Id. at 7.

Commerce then considered whether AEC pipe fell within the specific exclusion for "[a]ll pipes meeting aerospace, hydraulic, and bearing tubing specifications." ADD Order, 75 Fed.

---

[3] Although AEC concedes that "commodity pipe" could be threaded so as to meet the SAE Aerospace Standard, it claims that this "would not be accomplished without creating significant waste" and inspection costs. Scope Ruling Request at 6; see also Scope Ruling Request at 17. (noting that without the "tight dimensional requirements for AEC pipe it would be extremely difficult, wasteful, and expensive . . . for AEC pipe to meet the Aerospace Threading Standard"). In addition, AEC asserts that pipes failing to meet its specifications would not be tolerated by its customers given the propensity of less-specialized pipe to crack, leak, or break. Id. at 8–10.

Reg. at 69,052–53; CVD Order, 75 Fed Reg. at 69,051. Commerce found that, in its condition as imported, AEC pipe was not covered by this exclusion. Final Scope Ruling at 7–8.

AEC contends that its pipe falls within the aerospace exclusion and should not be subject to the Orders. See AEC Br. at 19–22. Specifically, AEC argues that its pipe meets various specifications that allow it to be easily threaded to meet the SAE Aerospace Standard AS71051B ("SAE Aerospace Standard") once in the United States. Id. at 20. Because the Orders do not define what "aerospace specifications" means, AEC argues that Commerce must read the exclusion expansively to cover AEC pipe even though the pipes do not meet the SAE Aerospace Standard until the pipes are threaded following importation. Id. at 31.

AEC further argues that the scope language is ambiguous and Commerce was obligated to conduct an analysis under 19 C.F.R. § 351.225(k)(1); id. at 22–27, and that the (k)(1) criteria supports a finding that AEC pipe is not subject merchandise. Id. at 27–33. AEC highlights that the petition lists neither AEC nor its supplier as involved in the export, import, or production of subject merchandise and that "none of the injury data provided by the Petitioners would be affected by the import of AEC pipe" as there is no comparable product available on the domestic market. Id. at 28. Regarding Commerce's investigation, AEC argues that Commerce indicated that the Orders were meant to cover "commodity pipe" and not specialized pipe meeting more exacting standards and thus the aerospace exclusion should be read to "capture all manner of custom pipes that contain any specifications suitable for aerospace." Id. at 28–31. AEC asserts that considerations expressed during the U.S. International Trade Commission ("ITC") investigation about specialized A-335 pipe indicate that the Orders were not intended to cover highly-specialized pipes such as AEC pipe. Id. at 31–33.

In the alternative, AEC argues that Commerce should have initiated a formal scope inquiry and considered the (k)(2) factors, which support the exclusion of AEC pipe from the Orders. Id. at 33–36. Finally, AEC contends that even if its pipe is within the scope of the Orders, Commerce cannot assess antidumping and countervailing duties on "shipments entered prior to the initiation of a formal scope ruling." Id. at 36–42.

The government responds that AEC pipe was clearly within the scope of the Orders such that consideration of (k)(1) criteria was not required. Def.'s Resp. to Pl.'s 56.2 Mot. for Summ. J. upon the Agency Record at 7, 10, 13–15, ECF No. 27 (Mar. 19, 2019) ("Def. Br."). The government argues that the Orders are unambiguous, and that Commerce need only consider the (k)(1) criteria if an order is ambiguous. Id. at 10–15. The government further claims that as AEC pipe does not meet any aerospace specification at importation, any potential ambiguity regarding the aerospace exclusion is irrelevant. Id. at 13–15. Finally, the government objects to AEC's claims that Commerce's liquidation instructions to Customs were impermissibly retroactive. Id. at 15–27.

Commerce is incorrect in finding that it need not consider the (k)(1) criteria in this case. The government relies heavily on the Court of Appeals for the Federal Circuit's ("CAFC") decision in Meridian to support its argument that Commerce did not need to consider the (k)(1) criteria. See Def. Br. at 9–12; Meridian Prods., LLC v. United States, 851 F.3d 1375, 1381 (Fed. Cir. 2017). As the court has stated previously, Meridian is considerably narrower than the government asserts. See Atkore Steel Components, Inc. v. United States, 313 F. Supp. 3d. 1374, 1380–1382 (CIT 2018) (stating that Meridian must be read in the light of what "the court

actually did based on particular facts").[4]

Although Meridian broadly states that Commerce must first "determine whether [an order's scope] contains an ambiguity and, thus, is susceptible to interpretation," even in that case the court considered (k)(1) sources, namely prior scope rulings, in concluding that the order at issue was unambiguous. See Meridian, 851 F.3d at 1381, 1384; see also Quiedan Co. v. United States, 927 F.3d 1328, 1333 (Fed. Cir. 2019) (finding the language of the order clear "considering the factors specified in § 351.225(k)(1)"); ArcelorMittal Stainless Belg. N.V. v. United States, 694 F.3d 82, 88–90 (Fed. Cir. 2012) (considering a prior scope ruling in determining whether an order was ambiguous). The language in Meridian should not be read out of context. As noted in Meridian, when a respondent cites (k)(1) sources as supporting a product's exclusion from the scope of an order, the court cannot consider the language of a scope order in isolation, but must consider those sources. See Meridian, 851 F.3d at 1383 (noting that the court "must first assess whether the plain language of the Orders' scope, in light of the disputed 19 C.F.R. § 351.225(k)(1) sources, is unambiguous"). Here, AEC sufficiently challenged the inclusion of its pipe in the Orders based on (k)(1) sources and so Commerce was not free to ignore these sources. Whether the order is ambiguous or not, Commerce's regulations are unambiguous– it "will take into account" the (k)(1) criteria in conducting a scope determination. 19 C.F.R. 351.225(k) (emphasis added). No case has invalidated this regulatory requirement.

The government defends Commerce's analysis by arguing that "AEC's pipe meets the

---

[4] Meridian dealt with a scope provision with an exception to a "clear" exclusion. Meridian, 851 F.3d at 1384–85. The court sincerely hopes Commerce will not write another scope provision that has general inclusion language, what the CAFC calls a "clear" exclusion to such inclusion, and then an exception to the exclusion. See id. This has resulted in considerable litigation, not to mention confusion. See, e.g., infra note 5.

written description of the scope" and that ambiguity in the exclusion language is irrelevant because AEC pipe does not meet all purported aerospace specifications until it is threaded after importation. Def. Br. at 13–14. But this reasoning is circular and confuses the analysis required by the regulations. Commerce should have first determined the meaning of the term "aerospace specifications" before concluding that the scope included AEC's pipe. Here, however, Commerce functionally decided that AEC's unfinished pipe did not meet aerospace specifications without first considering what "aerospace specification" means. As AEC notes, "aerospace specifications" could pertain to a number of different standards and the Orders do not specify any in particular. AEC Br. at 20–22. Because "aerospace specifications" is undefined, Commerce was obligated to consider the (k)(1) sources before rendering its decision. See Meridian, 851 F.3d at 1381 n.7, 1381–1382.[5]

Whether these sources are dispositive on the issue is unclear on the record before the court. Because Commerce did not consider the (k)(1) sources, the record only contains documents AEC submitted in conjunction with its Scope Ruling Request. AEC cites to some investigation documents and parts of the ITC report, which appear to indicate that the investigation was concerned with standard, non-specialized pipe and that petitioners may not have been injured by specialized pipe. In particular, AEC highlights materials submitted by

---

[5] The government's reliance on Whirlpool Corp. is unavailing. See Def. Br. at 9–13 citing Whirlpool Corp. v. United States, 890 F.3d 1302 (Fed. Cir. 2018). Unlike here, the exclusion at issue in that case was said to be unambiguous. Id. at 1309. If scope language clearly excludes a product, it cannot be within the scope as there would be a complete lack of notice to importers. Exclusion does not raise the issue of the coverage of the ITC investigation. Whirlpool, however, involved the same problematic scope provision addressed in Meridian so that the "clear" exclusion was limited by an exception, that may or may not be clear. See Id. at 1305–06; Meridian, 851 F.3d at 1379. Many of the broad statements in Meridian are repeated in Whirlpool including noting that by regulation Commerce must consider the (k)(1) sources. Whirlpool, 890 F.3d at 1308. The sources are not discussed further. Presumably, if someone had argued that there was not an ITC determination covering the product the court would have addressed that.

Salem Steel North America LLC ("Salem Steel") to Commerce in response to its invitation to provide comments on the scope language. According to AEC, these letters—which AEC claims ultimately resulted in the aerospace exclusion—support the exclusion of AEC pipe from the scope of the Orders. See, e.g., Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China; Response to Commerce Department's June 23 Proposal to Change Scope Language to Exclude Mechanical Tubing, A-570-956, ECF No. 29, Exhibit H at 2–7 (June 30, 2010) ("Salem Steel Letter") (describing how aviation tubing is a type of mechanical tubing that must conform to certain aerospace specifications); Case Brief of Salem Steel North America LLC, A-570-956, ECF No. 29, Exhibit I at 9–16 (July 14, 2010) ("Salem Steel Case Brief") (describing how mechanical tubing does not compete with standard pipe as it is neither cost-effective nor practical); Salem Steel Letter, Appendix A-2 at 5–6 (May 24, 2010) (noting the differences between mechanical tubing and standard pipe and citing conversations with petitioners who indicated that mechanical tubing was not intended to be included in the investigation).

In addition, AEC notes that the reasons given in the ITC Report for excluding A-335 pipe from the scope of the order support the exclusion of AEC pipe, which is, as AEC contends, similarly specialized. Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from China, Inv. Nos. 701-TA-469 & 731-TA-1168 (Final), USITC Pub. 4190 at I-20–I-22 (Nov. 2010) ("ITC Report") (noting that A-335 pipe, which was excluded by the Orders, was in part excluded because it had specifications that made interchangeability with standard pipe unusual and costly). If these cited materials actually support plaintiff's assertions and reflect the (k)(1) sources generally, subjecting AEC pipe to the Orders may run afoul of the requirement that there be a material injury or threat of material injury to domestic industry prior to the

imposition of such duties. 19 U.S.C. § 1671(a)(2); 19 U.S.C. § 1673(2). It appears from these documents that in general specialized pipe was not meant to be included within the scope of the Orders. If that is the case, and AEC pipe is also rightly described as such specialized pipe, then this merchandise may not properly within the scope of the Orders. By not considering the (k)(1) sources, as required by regulation, Commerce created a situation in which duties might be assessed against products without an injury determination. Indeed, preventing such a result is likely why the applicable regulations state that Commerce "will take into account" the (k)(1) criteria, including the ITC determination. 19 C.F.R. § 351.225(k); see also, Atkore, 313 F. Supp. at 1381–82 (discussing the importance of considering the (k)(1) sources).[6]

Commerce's failure to consider the "descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary . . . and the Commission," as required by 19 C.F.R. § 351.225(k)(1), in its Final Scope Ruling was not in accordance with law. Accordingly, the court will remand the matter for Commerce to consider the (k)(1) sources and, if those criteria are not dispositive of the issue, then Commerce must consider the additional (k)(2) factors in determining whether AEC pipe is properly included within the scope of the Orders. Because the court is ordering Commerce to reconsider its Final Scope Ruling, it does not address AEC's claim regarding Commerce's liquidation instructions.

## CONCLUSION

For the foregoing reasons, the matter is remanded for Commerce to conduct an analysis that considers the sources listed in 19 C.F.R. § 351.225(k)(1) in assessing whether AEC pipe

---

[6] Looking at (k)(1) sources does not make an order clear or unclear. The (k)(1) sources are what provide the answer as to whether an order is clear enough that no resort to (k)(2) factors is necessary. See 19 C.F.R. § 351.225(k). Further, "no formal inquiry is required where a (k)(1) analysis is dispositive." Quiedan, 927 F.3d at 1333.

falls within the scope of the Orders. If this analysis is not dispositive, Commerce should proceed with a formal scope inquiry and consider the factors specified in 19 C.F.R. § 351.225(k)(2).

Thus, upon consideration of the plaintiff's motion for judgment on the agency record and all papers and proceedings had in relation to this matter, and upon due deliberation, it is hereby

**ORDERED** that plaintiff's motion for judgment on the agency record is **GRANTED** in part;

**ORDERED** that Commerce, within 90 days from the date of issuance of this Opinion and Order, shall submit a Remand Redetermination in compliance with this Opinion and Order;

**ORDERED** that defendant shall supplement the administrative record with all documents considered by Commerce in reaching its decision in the Remand Redetermination;

**ORDERED** that plaintiff shall have 30 days from the filing of the Remand Redetermination to submit comments to the court; and

**ORDERED** that defendant shall have 15 days from the date of the plaintiff's filing of comments to submit a response.

/s/Jane A. Restani
Jane A. Restani, Judge

Dated: August 13, 2019
New York, New York