Slip Op. 20-44

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TMB 440AE, INC. (FORMERLY KNOWN AS ADVANCE ENGINEERING CORPORATION),<br><br>               Plaintiff,<br><br>     v.<br><br>UNITED STATES,<br><br>               Defendant. | Before: Jane A. Restani, Judge<br><br>Court No. 18-00095 |

## OPINION AND ORDER

[Commerce's Final Results of Remand Redetermination are remanded]

Dated: April 6, 2020

     Ned H. Marshak, Jordan C. Kahn , and David M. Murphy, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY and Washington D.C., and Dale E. Stackhouse and Meghann C. T. Supino, Ice Miller LLP, of Indianapolis, IN for Plaintiff TMB 440AE, Inc.

     Elizabeth Speck, Senior Trial Counsel, Civil Division, U.S. Department of Justice, of Washington D.C., for the defendant. With them on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director. Of counsel on the brief was Vania Wang, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

     Restani, Judge: Before the court is the United States Department of Commerce's

("Commerce") Final Results of Remand Redetermination, ECF No. 44-1 (Nov. 11, 2019)

("Remand Results") following the court's opinion and order in TMB 440 AE, Inc. v. United

States, 399 F. Supp. 3d 1314 (CIT 2019) ("Remand Order"). The court ordered Commerce to

reconsider its decision finding that seamless pipe imported by TMB 440AE, Inc. (formerly

known as Advance Engineering Corporation) ("AEC") was within the scope of antidumping and

countervailing duty orders on certain seamless pipe from the People's Republic of China

("PRC"). Id. at 1316; see also Certain Seamless Carbon and Alloy Steel Standard, Line, and

Pressure Pipe from the People's Republic of China: Amended Final Determination of Sales at

Less Than Fair Value and Antidumping Duty Order, 75 Fed. Reg. 69,052 (Dep't Commerce

Nov. 10, 2010) ("ADD Order"); Certain Seamless Carbon and Alloy Steel Standard, Line, and

Pressure Pipe from the People's Republic of China: Amended Final Affirmative Countervailing

Duty Determination and Countervailing Duty Order, 75 Fed. Reg. 69,050 (Dep't Commerce

Nov. 10, 2010) ("CVD Order") (collectively, the "Orders"). The court required Commerce to

consider the sources listed in 19 C.F.R. § 351.225(k)(1)[1] ("(k)(1) sources") in making its

assessment of the scope of the Orders and to proceed to consider the factors listed in 19 C.F.R. §

351.225(k)(2) ("(k)(2) factors") if these sources were not dispositive. Remand Order at 1322.

Following remand, and after consulting those (k)(1) sources, at least in part, Commerce

continues to find that AEC's pipe is within the scope of the orders. See Remand Results at 5. For

the reasons stated below, Commerce's decision is remanded.

## BACKGROUND

The court presumes familiarity with the facts of this case and will recount them only as

necessary. The Orders cover certain seamless pipe from the PRC,[2] but exclude:

---

[1] The sources include the "descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission." 19 C.F.R. § 351.225(k)(1).

[2] The Orders cover:

> [C]ertain seamless carbon and alloy steel (other than stainless steel) pipes and redraw hollows, less than or equal to 16 inches (406.4 mm) in outside diameter, regardless of wall-thickness, manufacturing process (e.g., hot-finished or cold-drawn), end finish (e.g., plain end, beveled end, upset end, threaded, or threaded and coupled), or surface finish (e.g., bare, lacquered or coated). Redraw hollows are any unfinished carbon or alloy steel (other than stainless steel) pipe or "hollow profiles" suitable for cold finishing operations, such as cold drawing, to meet the

(1) All pipes meeting aerospace, hydraulic, and bearing tubing specifications; (2) all pipes meeting the chemical requirements of ASTM A-335, whether finished or unfinished; and (3) unattached couplings. Also excluded from the scope of the order are all mechanical, boiler, condenser and heat exchange tubing, except when such products conform to the dimensional requirements, i.e., outside diameter and wall thickness of ASTM A-53, ASTM A-106 or API 5L specifications.

ADD Order, 75 Fed. Reg. at 69,052–53; CVD Order, 75 Fed. Reg. at 69,051. AEC was not

identified by petitioning domestic industry during the underlying investigations by Commerce

and the U.S. International Trade Commission ("ITC") and did not participate in the creation of

the Orders. Although the Orders were issued on November 10, 2010, AEC did not receive a

Notice of Action from United States Customs and Border Protection until October 3, 2016,

informing AEC that it was subject to duties pursuant to the Orders. See Remand Results at 27.

AEC requested a scope ruling from Commerce on October 20, 2017. Id. at 3.

AEC contended that its pipe either (1) properly fell within the "aerospace exclusion"

because its pipe is threaded to meet a particular aerospace threading standard following

importation or (2) should be excluded because its pipe is specialized, and the Orders are intended

to apply solely to commodity pipe.  See Remand Order at 1319. Without consulting the (k)(1)

sources, Commerce determined that the Orders were unambiguous and clearly included AEC's

pipe. Id. at 1320. The court held that Commerce was required to consult these sources to

determine whether AEC pipe was properly included in the scope of the Orders and remanded for

reconsideration. Id. at 1322.

---

American Society for Testing and Materials ("ASTM") or American Petroleum Institutes ("API") specifications referenced below, or seamless carbon and alloy steel (other than stainless steel) standard, line, and pressure pipes produced to the ASTM A-53, ASTM A-106, ASTM A-334, ASTM A-589, ASTM A-795, ASTM A-1024, and the API 5L specifications, or comparable specifications, and meeting the physical parameters described above, regardless of application[.]

ADD Order, 75 Fed. Reg. at 69,053; CVD Order, 75 Fed. Reg. at 69,051.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2012).[3] The court has

authority to review Commerce's decision that merchandise falls within an antidumping or

countervailing duty order. 19 U.S.C. § 1516a(a)(2)(B)(vi). Commerce's scope determination will

be upheld unless it is "unsupported by substantial evidence on the record, or otherwise not in

accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination

pursuant to court remand are also reviewed for compliance with the court's remand order."

Xinjiamei Furniture (Zhangzhou) Co. v. United States, 968 F. Supp. 2d 1255, 1259 (CIT 2014)

(internal quotation and citation omitted).

"Scope orders may be interpreted as including subject merchandise only if they contain

language that specifically includes the subject merchandise or may be reasonably interpreted to

include it." Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1089 (Fed. Cir. 2002). Further,

Commerce has the authority to clarify the scope of a prior order, but it cannot interpret an order

"in a way contrary to its terms." Whirlpool Co. v. United States, 890 F.3d 1302, 1308 (Fed. Cir.

2018) (internal quotation and citation omitted).

## DISCUSSION

By the text of the Orders alone without the context of the investigation, AEC pipe would

appear to fall within their scope. On remand, Commerce considered the (k)(1) sources to

ascertain the intended meaning of "aerospace specifications," Remand Results at 6–12, and the

ASTM A-335 exclusion, id. at 16–18, and found that AEC's pipe was not within either. Id. AEC

argues that the remand redetermination is not supported by substantial evidence because the

(k)(1) sources do not support Commerce's narrow reading of the "aerospace specifications"

---

[3] All further citations to the U.S. Code are to the 2012 edition unless otherwise indicated.

Case 1:18-cv-00095-JAR    Document 54    Filed 04/06/20    Page 5 of 15

Court No. 18-00095                                                      Page 5

exclusion and because the (k)(1) sources reveal that specialized pipe was not meant to be

included in the scope of the Orders. Pl.'s Cmts. On Final Remand Redetermination, ECF No. 47

at 8–26 (Jan. 9, 2020) ("AEC Br."). In the alternative, AEC argues that the (k)(1) sources do not

clarify the Orders and that Commerce was required to conduct a full scope inquiry and consider

the factors listed in 19 C.F.R. § 351.225(k)(2). Finally, if AEC pipe is found within the scope of

the Orders, AEC contends that the agency cannot impose antidumping and countervailing duties

retroactively. Id. at 26–33.

## I.    "Aerospace Specifications" Exclusion

Commerce claims that the "aerospace specifications" exclusion originated during the

investigation following a recommendation made by Salem Steel North America LLC ("Salem

Steel") to exclude "aviation tubing" from the Orders. Remand Results at 7–8. In a subsequent

letter, Salem Steel[4] elaborated that "[a]viation, or aerospace material, seamless tubing" all "must

conform to certain Aerospace Material Specifications" and that this included producing tubing to

the "AMS-T-6736A standard," which requires the use of "one of two specific alloys – either

4130 chromium molybdenum steel alloy or 8630 alloy." Letter from Dorsey & Whitney LLP to

the Sec'y of Commerce on behalf of Salem Steel re "Certain Seamless Carbon and Alloy Steel

Standard, Line, and Pressure Pipe from the People's Republic of China; Response to Commerce

---

[4] Salem Steel is a producer of cold drawn seamless mechanical tubing ("CD Mechanical
Tubing"). In arguing that CD Mechanical Tubing should be excluded, Salem Steel stated that
whereas seamless pipes are "commodity products made to standard pipe sizes having a nominal
outside diameter," Salem Steel products are "made to specific order and strict engineering
specifications, not standard pipe sizes." Letter from Dorsey & Whitney LLP to the Sec'y of
Commerce on behalf of Salem Steel North America LLC re "Certain Seamless Carbon and Alloy
Steel Standard, Line, and Pressure Pipe from the People's Republic of China; Request for
Change in Scope Language to Exclude Mechanical Tubing," A-570-956, C-570-957, ECF No.
52-1, at 2 (May 24, 2010) ("Salem Steel May Letter"). Additionally, Salem Steel stressed that
using CD Mechanical Tubing in place of standard seamless pipe would not be cost effective as it
is "40 to 300% more expensive." Id. at 7–8.

Department's June 23 Proposal to Change Scope Language to Exclude Mechanical Tubing," A-570-956, C-570-957, at 6–7 (June 30, 2010) ("Salem Steel June 30 Letter")). Commerce further contends, based on the same documents, that the aerospace exclusion was meant to apply "only to CD mechanical tubing," which additionally requires adherence to AMS2253E, a standard defining dimensional tolerances for mechanical tubing. Remand Results at 8–9 & n.22 (citing Salem Steel June 30 Letter, at 7). Given the absence of other record information about aerospace specifications, Commerce states that it "implicitly accepted Salem Steel's description of aerospace standards," which meant adopting AMS-T-6736A as defining the chemical requirements and AMS2253E as defining the dimensional requirements of pipe meeting "aerospace specifications" for the purposes of the exclusion. Id. at 11.

According to Commerce, AEC pipe does not satisfy these requirements as it does not contain the requisite percent of molybdenum or chromium to satisfy the AMS-T-6736A standard and does not meet the "tight dimensional requirements" to meet the AMS 2253E standard. Id. at 12–13. Commerce rejected AEC's contention that the threading its pipe undergoes after importation, which meets aerospace threading standard SAE AS71051B, requires Commerce to find that the pipe fits within the "aerospace specification" exclusion. Id. at 13–15.

AEC asserts that Commerce is "invent[ing] a definition that never existed on the record" and that it is now improperly defines "aerospace specifications" too narrowly. AEC Br. at 8. It asserts that Salem Steel never purported to define the term. Id. at 8–9. Further, rather than implicitly accepting Salem Steel's proposal, Commerce rejected Salem Steel's proposed exclusion language, "seamless aviation tubing conforming to AMS-T-6736A and AMS 2253E," in favor of the broader standard evinced by all pipes meeting aerospace, hydraulic, and bearing tubing specifications. See id. at 14 (citing Salem Steel June 30 Letter, at 9). AEC continues to

claim that it's pipe should fall within the aerospace exclusion because it can be threaded to certain aerospace threading standards after import. See id. at 14–15.

AEC's argument regarding the "aerospace specifications" exclusion fails for two primary reasons. First, AEC functionally asks the court to read the exclusion without the context of the (k)(1) sources to find that aerospace specifications means any aerospace specification despite that the exclusions appears to have originated at the behest of a single company, Salem Steel. The court did not order Commerce to consider the (k)(1) sources intending to discount them on review. Commerce, in fact, is required to use the (k)(1) sources to ascertain ambiguous language to determine its meaning. See 19 C.F.R. § 351.225(k)(1).

Although AEC is correct that there was no significant discussion of "aerospace specifications" prior to the publishing of the Orders, the relevant evidence supports Commerce's understanding of what the "aerospace specification" exclusion was meant to cover. Salem Steel's letter can be reasonably read to equate aviation and aerospace tubing and does explicitly state that such tubing is "subject to the AMS-T-6736A and AMS 2253E standards." Salem Steel June 30 Letter, at 6; see also Viet I–Mei Frozen Foods Co. v. United States, 839 F.3d 1099, 1106 (Fed. Cir. 2016) (noting that the possibility of drawing multiple conclusions from the same evidence does not preclude Commerce's factual determinations from being unsupported by substantial evidence) (citation omitted). It matters not that Salem Steel did not claim to define what "aerospace specifications" meant; what matters is whether Commerce's understanding the meaning of "aerospace specifications" is reasonable, supported by the record, and does not expand the scope of the order beyond its language. Compare Whirlpool, 890 F.3d at 1308 (courts "grant Commerce substantial deference with regard to its interpretation of its own Orders.") with 19 U.S.C. § 1516a(b)(1)(B)(i) (courts uphold Commerce's scope rulings unless they are

unsupported by substantial evidence or otherwise not in accordance with law). The only (k)(1)

sources identified by the parties that appear to reference aerospace do so in relation to the AMS-

T-6736A and AMS 2253E standards.[5] Thus, it was reasonable for Commerce to determine that

"aerospace specifications" narrowly applied to these specific standards discussed during the

investigation. See Fedmet Res. Corp. v. United States, 755 F.3d 912, 921 (Fed. Cir. 2014)

("[T]he reason why the (k)(1) sources are afforded primacy in the scope analysis is because

interpretation of the language used in the orders must be based on the meaning given to that

language during the underlying investigations."). AEC does not contend that its merchandise

satisfies these chemical and dimensional standards and the record supports Commerce's finding

that it does not. See Remand Results at 12–13.

Second, even if Commerce's clarification of the definition of "aerospace specification"

were unreasonable, it is still reasonable for Commerce to set the moment of inquiry to the time of

importation in this case. See S. F. Candle Co. v. United States, 206 F. Supp. 2d 1304, 1314 (CIT

2002) (noting that Commerce tends to look at the condition of the merchandise "at the time of

importation or purchase by the consumer, not at the time of consumption."). AEC does not

contend that it meets its claimed aerospace threading specification at import, but rather argues

that its pipe is designed in such a way that it can be threaded to this specification after import. To

allow AEC to prevail on this line of argumentation would likely create an unworkable standard

---

[5] That Commerce did not use the specific exclusion language offered by Salem Steel does not
necessarily mean, as AEC appears to argue, that Commerce wholesale rejected that language.
See AEC Br. at 10. It is more likely that Commerce believed that the exclusion language did not
have to list each of the applicable standards as the Salem Steel letter appears to indicate that all
aviation, hydraulic, and bearing tubing must confirm to the specific standards listed in Salem
Steel's proposed exclusion language. See Salem Steel June 30 Letter, at 6–9. Accordingly,
simply stating aviation, hydraulic, and bearing implicitly meant pipes that satisfied the standards
detailed in the Salem Steel June 30 Letter such that listing the specific standards might have been
redundant.

and broaden the opportunity for potential circumvention. Accordingly, the court sustains

Commerce's finding that AEC's pipe does not fall within the "aerospace specification"

exclusion.

## II.    The ASTM A-335 Exclusion

Prior to the court's remand, AEC argued that the rationale given for excluding ASTM A-

335 ("A-335") pipe from the scope of the Orders—namely its specialized nature and the

unfeasibility of substituting costly A-335 pipe for "commodity pipe" subject to the Orders—

supported excluding AEC pipe as well. Remand Order at 1322. On remand, Commerce

considered the origin on the A-335 pipe exclusion and found that it narrowly applied to the

chemical specifications of A-335 pipe and originated following a comment by a U.S. company,

Wyman-Gordon Inc. ("Wyman-Gordon"), after A-335 pipe was initially included in the Petition.

Remand Results at 16–17. Because AEC pipe does not satisfy the chemical requirements of A-

335 pipe, which allows for use at very high temperatures, Commerce asserts that AEC pipe is

properly outside of that exclusion. Id. at 17–18.

AEC argues that Commerce misunderstood its argument. AEC Br. at 16–17. It argues

that the A-335 pipe exclusion was prompted by a desire to exclude specialized pipe "made to

tight tolerances and precise dimensional and chemical requirements," like AEC pipe. Id. at 17.

AEC contends that its pipe was not included in the petition nor the investigation precisely

because it, like the A-335 pipe, was not the intended target of the investigation. Id. AEC argues

that the A-335 pipe exclusion, like the aerospace specifications exclusion, evinces an intent to

exclude specialized pipe. Id. at 17–25.

Defendant, the United States (the "government"), acknowledges that the request to

exclude A-335 pipe was made because it is "an inherently different product from seamless" pipe.

Def.'s Resp. to the Parties' Cmts. On the Dep't of Commerce's Final Results of

Redetermination, ECF No. 50, at 19 (Feb 11, 2020) ("Gov. Br."). It goes on to reiterate,

however, the point that the narrow exclusion was made following a request by a specific

domestic manufacturer and applies only to pipe meeting certain chemical specifications, which

does not include AEC pipe. Gov. Br. at 19–20.

      Commerce's explanation and analysis do not sufficiently address the issue at hand. In

response to AEC's comments on the remand redetermination, Commerce asserts that exclusions

were given to some types of specialized pipes, but not all, at the behest of certain companies

during the investigation. See Remand Results at 24 (noting that "[v]arious types of products that

are specialized to meet certain needs beyond standard A-53 usage, including specializations that

AEC pipe does not meet, are included in the Orders: A-333 and A-334 for low-temperature

service, A-106 for high-temperature service, A-795 for fire protection."). AEC argues that

Commerce must determine whether the rationales given for excluding some products applies

with equal force to AEC's products. See AEC Br. at 21–23. The government responds that the

exclusions were narrow and not meant to apply to specialized pipe generally. Gov. Br. at 14, 17–

18. The court does not doubt that Commerce intended the exclusions to be narrow, but

Commerce needs to consider whether the reasons for excluding some specialized pipe applies

equally to AEC's pipe. For example, would a complete and fair review of the Petition and the

ITC Investigation demonstrate that the Orders were not intended to cover AEC's type of pipe.

      Commerce failed to address this court's concern regarding the A-335 pipe exclusion. The

court found that AEC might be correct that excluding the A-335 pipe was indicative of an intent

to exclude those types of specialized pipe that was not realistically interchangeable with the

types of pipe covered by the Orders. See Remand Order at 1322. Commerce's cursory review of

the record regarding the A-335 pipe exclusion fails to satisfactorily address AEC's, and the

court's, concerns. The government admits that the reasoning prompting the A-335 pipe

exclusion[6] was its inherent difference from the pipe the Orders clearly intended to cover. Gov.

Br. at 19. It remains unclear if AEC pipe should also be considered inherently different from the

subject pipe, albeit potentially based on somewhat different reasons than those given as to

excluded pipe. Apparently, Commerce misunderstood the court's remand order. Commerce

limited itself to the range of specific exclusions. It did not properly consider all (k)(1) source

material, positive and negative.

The need to provide more complete analysis is further evidenced by a brief submitted by

Petitioners to the U.S. International Trade Commission during the investigation, which, in

relevant part states that "all parties (domestic producers, importers, and MC Tubular itself) agree

that domestic seamless pipe is "like" the imported seamless pipe subject to the investigation only

if it is used in standard, line and pressure pipe applications." U.S. Steel Corp., Case Br. re

"Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic

of China," A-570-956, C-570-957, ECF No. 52-1, at 61-62 (July 14, 2010). It remains unclear to

the court whether "standard, line and pressure pipe applications" includes the applications AEC

purports is the use of its pipe. Commerce has not made findings as to whether AEC pipe was

considered during the underlying investigations by Commerce and the ITC. Although an

---

[6] In discussing A-335 pipe, the ITC's Final Report notes that the domestic producers admit that the interchangeability of that pipe with subject pipe would be "unusual, one-way, and costly," that A-335 is higher priced that other forms of seamless pipe. Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from China, Investig. Nos. 701-TA-469 and 731-TA-1168 (Final) ECF No. 52-1, at I-21 (U.S. Int'l Trade Comm'n Nov. 2010) ("Final ITC Report").

unpublished opinion, the Federal Circuit's reasoning in A.L. Patterson, Inc. v. United States, is

useful here. See 585 F. App'x 778 (Fed. Cir. 2014) (unpublished).

      In that case, the Federal Circuit held that although Patterson's steel coil rod facially fell

within the language of the Order at issue, Commerce had failed to offer evidence that the

merchandise fell within the domestic industry that the ITC investigated and did not address

evidence demonstrating that merchandise was physically distinguishable from the merchandise

the Petitioner intended to be covered by the Order. Id. at 783–84 (noting that that merchandise

meeting the physical specification of an order "only begins the inquiry" and that when a party

presents "evidence showing that [the merchandise at issue] is a distinct domestic market that the

Commission did not investigate" then Commerce had to make findings on that point); see also

Trendium Pool Prods., Inc. v. United States, 399 F. Supp. 3d 1335, 1342-44 (CIT 2019) (relying

on Patterson to find that even though the merchandise at issue in that case was specifically

mentioned in the Orders, further processing rendered that merchandise outside of the scope).

Here, although AEC pipe appears to fall within the bare language of the scope in that it is

"seamless carbon and alloy steel (other than stainless steel) standard, line, and pressure pipes

produced to the ASTM A-53, ASTM A-106 . . . or comparable specifications," ADD Order, 75

Fed. Reg. at 69,052–53; CVD Order, 75 Fed. Reg. at 69,051, AEC has put forth evidence that,

despite its product meeting the dimensional specifications of A-53, its product is specialized

beyond standard A-53 pipe. See AEC Br. at 15–16. Accordingly, AEC pipe may well exceed the

listed specifications as well as "comparable specifications" contemplated by the Orders.

Commerce is not free to ignore this evidence. See Mitsubishi Polyester Film, Inc. v. United

States, 321 F. Supp. 3d 1298, 1304 (CIT 2018) (Commerce must "analyze the 'descriptions of

the merchandise contained in the petition, [and] the original investigation' on the record,

including those that fairly detract from its determination") (emphasis added) (alteration in

original) (quoting Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951).

Turning to the (k)(1) sources, the petition indicates the seamless pipes intended to be

covered are used "for the conveyance of water, steam, petrochemicals, chemicals: oil products,

natural gas; and other liquids and gasses in industrial piping systems." U.S. Steel Corp., "Petition

for the Imposition of Antidumping and Countervailing Duties," A-570-956 and C-570-957, ECF

No. 52-1, at 5 (Sep. 16, 2009) ("Petition"). The ITC's Final Report primarily discusses the use of

seamless pipe for natural gas in relation to refinery facilities, construction, and industrial

applications. See Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe

from China, Investig. Nos. 701-TA-469 and 731-TA-1168 (Final), ECF No. 52-1, at 6, I-3, I-10,

I-18, II-1 (U.S. Int'l Trade Comm'n Nov. 2010) ("Final ITC Report"). Neither the Petition nor

the Final ITC Report appear to discuss subject pipe specifically for residential use, although the

Final ITC Report does state that end-use applications include "plumbing and heating systems, air

condition units, [and] automatic sprinklers." Final ITC Report, at I-10.

AEC admits that its pipes are used in the conveyance of natural gas, but it notes that

rather than being used for industrial purposes, its pipe is used for a "niche market," which

includes producing "custom meter sets for the gas utility industry for residential use." See Letter

from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to the Sec'y of Commerce on

behalf of AEC re "Advance Engineering Corporation Scope Request," A-570-956, C-570-957,

P.R. 1-4, C.R. 1-4, at 3 (Oct. 20, 2017) ("AEC Scope Request"). AEC claims that standard

ASTM A-53 pipe is not safely useable for this purpose. Id. at 3–5. AEC further contends that its

pipe's chemical specifications, additional finishing, tighter dimensional tolerances, more

exacting storing and packaging, and customization render it materially different from the pipe

covered by the Orders. Id. at 4–13, Exhibits A–F (describing the AEC pipe Specifications as

compared to subject pipe). As indicated, the Petition does not name AEC as a producer,

importer, or seller of subject merchandise or in any other capacity. See Petition, at Exhibit I-11,

I-14. Finally, AEC claims that it has been unable to domestically source its pipe. AEC Scope

Request, at 8–10 (citing exhibits comparing its product to domestically available pipe).

Although before the court, the government rejects AEC's contention that the Orders were

concerned with "commodity pipe," it ignores evidence from the investigation showing that

domestic industry, importers, and even Commerce referred to the merchandise covered by the

Orders as commodity pipe. See, e.g., Salem Steel May Letter, at 2, 4-7; Letter from Steptoe &

Johnson LLP to the Sec'y of Commerce on behalf of MC Tubular Products, Inc. re "Certain

Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe from the People's Republic

of China: Comments on Department's June 23, 2010 Proposed Scope Modification," A-570-956,

C-570-957, ECF No. 52-1, at 4 (June 30, 2010); Salem Steel June 30 Letter, at 2; Mem. from

Zev Primor, Senior Int'l Trade Analyst, to the File, "U.S. Customs and Border Protection's

Inquiry Regarding Mechanical Tubing," A-570-956, C-570-957, ECF No. 52-1 at 1 ( June 23,

2010) (noting that Commerce issued guidance stating that "[g]enerally, the seamless standard,

line and pressure pipes are commodity products"); Hearing Tr., "Certain Seamless Carbon and

Alloy Steel Standard, Line, and Pressure Pipe from China,  Investig. Nos. 701-TA-469 and 731-

TA-1168 (Final)," ECF No. 52-1, at 68:2–6 (U.S. Int'l Trade Comm'n Sept. 14, 2010)

(representative from domestic industry stating that "[m]ore and more customers use seamless

SLP pipe as a commodity product" and that American companies cannot compete with "dumped

and subsidized Chinese imports"). While these references may not be dispositive on whether the

Orders were primarily or exclusively targeting "commodity pipe," Commerce cannot ignore this evidence undermining its position.

At base, Commerce's conclusion that that (k)(1) sources are dispositive on whether AEC's pipe is properly included in the scope is unsupported by substantial evidence and clear reasoning. Commerce cannot ignore the context given to the order language, both inclusive and exclusive, and whether AEC's pipe was covered by the ITC determination that certain pipe possessed material injury or threat of material injury to domestic producers. See Remand Order at 1322. Commerce must address AEC's claims to avoid frustrating the purpose of antidumping and countervailing duties by potentially subjecting merchandise to those duties without an injury determination. See Wheatland Tube Co. v. United States, 161 F.3d 1365, 1371 (Fed Cir. 1998).

Commerce must move beyond the words of the particular exclusions found in the Orders and complete a (k)(1) analysis. If that leaves Commerce in doubt, it must proceed to consider the factors listed in 19 C.F.R. § 351.225 (k)(2).[7]

## CONCLUSION

For the foregoing reasons, Commerce's Remand Results are remanded for further consideration. Remand results are due within 90 days of the date of this decision. Any comments on the remand results shall be submitted within 30 days of the filing of the results. Replies on the comments are due 15 days thereafter.

/s/Jane A. Restani
Jane A. Restani, Judge

Dated: April 6, 2020
      New York, New York

---

[7] Because the court is remanding for Commerce to reconsider its determination the court does not, at this stage of the proceedings, address AEC's arguments about Commerce's retroactive imposition of duties.