Slip Op. 20-169

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **TMB 440AE, INC. (FORMERLY KNOWN AS ADVANCE ENGINEERING CORPORATION),** Plaintiff, v. **UNITED STATES,** Defendant. | **Before: Jane A. Restani, Judge** **Court No. 18-00095** **PUBLIC VERSION** |

## OPINION

[Department of Commerce Scope Determination regarding Seamless Pipe from the People's Republic of China is sustained.]

Dated: November 27, 2020

Ned H. Marshak, Jordan C. Kahn , and David M. Murphy, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY and Washington D.C., and Dale E. Stackhouse and Meghann C. T. Supino, Ice Miller LLP, of Indianapolis, IN for Plaintiff TMB 440AE, Inc.

Elizabeth A. Speck, Senior Trial Counsel, and Patricia M. McCarthy, Assistant Director, Civil Division, U.S. Department of Justice, of Washington D.C., and of counsel Vania Y. Wang, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C. for defendant United States. With them on the brief were Jeffrey B. Clarke, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director.

Restani, Judge: Before the court is the United States Department of Commerce's

("Commerce") Final Results of Second Remand Redetermination, ECF No. 57-1 (Jul. 20, 2020)

("Second Remand Results") following the court's opinion and order in TMB 440AE, Inc. v.

United States, Slip Op. 20-44, 2020 WL 1672841 (CIT Apr. 6, 2020) ("Second Remand Order").

The court ordered Commerce to reconsider its determination finding that seamless pipe imported

by TMB 440AE, Inc. (formerly known as Advance Engineering Corporation) ("AEC") was

within the scope of antidumping and countervailing duty orders on certain seamless pipe from

the People's Republic of China ("PRC"). Id. at *5–7; see also Certain Seamless Carbon and

Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China: Amended

Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order, 75 Fed.

Reg. 69,052 (Dep't of Commerce Nov. 10, 2010) ("ADD Order"); Certain Seamless Carbon and

Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China: Amended

Final Affirmative Countervailing Duty Determination and Countervailing Duty Order, 75 Fed.

Reg. 69,050 (Dep't of Commerce Nov. 10, 2010) ("CVD Order") (collectively, the "Orders").

The court required Commerce to consider the sources listed in 19 C.F.R. § 351.225(k)(1) ("(k)(1)

sources") in making its assessment of the scope of the Orders and to proceed to consider the

factors listed in 19 C.F.R. § 351.225(k)(2) ("(k)(2) factors") if these sources were not dispositive.

Second Remand Order at *5–7.

Following remand, and after consulting those (k)(1) sources, Commerce

continues to find that AEC's pipe is within the scope of the Orders. See Second Remand Results

at 2. For the reasons stated below, Commerce's determination is sustained.

## BACKGROUND

The court presumes familiarity with the facts of this case and will recount them only as

necessary. The Orders cover certain seamless pipe from the PRC,[1] but exclude:

---

[1] The Orders cover:

 (1) All pipes meeting aerospace, hydraulic, and bearing tubing specifications; (2) all pipes meeting the chemical requirements of ASTM A-335, whether finished or unfinished; and (3) unattached couplings. Also excluded from the scope of the order are all mechanical, boiler, condenser and heat exchange tubing, except when such products conform to the dimensional requirements, i.e., outside diameter and wall thickness of ASTM A-53, ASTM A-106 or API 5L specifications.

ADD Order, 75 Fed. Reg. at 69,052–53; CVD Order, 75 Fed. Reg. at 69,051. The Orders were

issued on November 10, 2010, but AEC did not receive a Notice of Action from United States

Customs and Border Protection ("CBP") until October 3, 2016, informing AEC that it was

subject to duties pursuant to the Orders. See Second Remand Results at 1 n.4, 44. On October 20,

2017, AEC requested that Commerce conduct a scope ruling. See Letter from Grunfeld,

Desiderio, Lebowitz, Silverman & Klestadt LLP to the Sec'y of Commerce on behalf of AEC re

"Advance Engineering Corporation Scope Request," A-570-956, C-570-957, P.R. 1-4, C.R. 1-4,

at 1 (Oct. 20, 2017) ("AEC Scope Request").

Commerce determined that the AEC pipe fell within the language of the Orders and did

not meet the criteria to satisfy any exclusion. See TMB 440 AE, Inc. v. United States, 399 F.

Supp. 3d 1314, 1317 (CIT 2019) ("First Remand Order"). AEC asserted that its pipe fell within

---

[C]ertain seamless carbon and alloy steel (other than stainless steel) pipes and redraw hollows, less than or equal to 16 inches (406.4 mm) in outside diameter, regardless of wall-thickness, manufacturing process (e.g., hot-finished or cold-drawn), end finish (e.g., plain end, beveled end, upset end, threaded, or threaded and coupled), or surface finish (e.g., bare, lacquered or coated). Redraw hollows are any unfinished carbon or alloy steel (other than stainless steel) pipe or "hollow profiles" suitable for cold finishing operations, such as cold drawing, to meet the American Society for Testing and Materials ("ASTM") or American Petroleum Institutes ("API") specifications referenced below, or seamless carbon and alloy steel (other than stainless steel) standard, line, and pressure pipes produced to the ASTM A-53, ASTM A-106, ASTM A-334, ASTM A-589, ASTM A-795, ASTM A-1024, and the API 5L specifications, or comparable specifications, and meeting the physical parameters described above, regardless of application[.]

ADD Order, 75 Fed. Reg. at 69,053; CVD Order, 75 Fed. Reg. at 69,051.

the "aerospace specification" exclusion or should otherwise be excluded because, in its view, the Orders were not intended to cover its specialized pipe. See id. at 1317, 1319. Without consulting the (k)(1) sources, Commerce determined that the Orders were unambiguous and clearly included AEC's pipe. See id. The court held that Commerce was required to consult these sources in determining if AEC's pipe was properly included in the scope of the Orders and remanded for reconsideration. See id. at 1322. On remand, Commerce consulted the (k)(1) sources and determined that AEC's pipe did not satisfy either the "aerospace specification" exclusion or the ASTM A-335 specialized pipe exclusion. See Final Results of Remand Redetermination, ECF No. 44-1, at 6–12, 16–18 (Nov. 11, 2019) ("First Remand Results"). The court sustained Commerce's determination that AEC's pipe did not fall within the "aerospace specification" exclusion, see Second Remand Order at *2–4, but determined that Commerce misapprehended the question at hand and needed to further explain whether the Orders covered pipe with the claimed specialized properties of AEC's pipe. Id. at *4–7.

On second remand, after consulting the (k)(1) sources as instructed by the court, Commerce determined once again that AEC's pipe fell within the scope of the Orders. Second Remand Results at 1–2. Commerce determined that the (k)(1) sources were dispositive and maintained that the term "commodity" pipe[2] as used in the sources was never meant to define the scope of the Orders to the exclusion of specialized pipe like AEC's pipe. See id. at 24, 43. Commerce determined that the properties of AEC's pipe were not sufficiently analogous to ASTM A-335 pipe, ultimately finding that the reasons behind the ASTM A-335 exclusion did not apply to AEC's pipe. See id.

---

[2] AEC uses the term "commodity" pipe to refer to standard, "off the shelf" pipe that has no specialized properties. For further discussion of this term see Section I(B) of this opinion.

AEC contends that Commerce's determination was not supported by substantial evidence because an analysis of the (k)(1) sources revealed that the Orders were intended to apply solely to "commodity" pipe and exclude pipe with AEC's specialized properties. See Pl.'s Cmts. On Second Remand Redetermination, ECF No. 60, at 22–25 (Aug. 19, 2020) ("AEC Br."). In addition, AEC argues that the reasons underlying the creation of the A-335 specialized pipe exclusion also apply to AEC's pipe. See id. at 7–8. In the alternative, AEC contends that the (k)(1) sources do not clarify the Orders and that Commerce was required to conduct a full scope inquiry and consider the (k)(2) factors. See id. at 7. Finally, if AEC's pipe is within the scope of the Orders, AEC contends that Commerce cannot impose antidumping and countervailing duties retroactively, and that its instruction to CBP to continue to suspend liquidation of entries of AEC's pipe was contrary to law. See id. at 3, 28–31.

<b>JURISDICTION AND STANDARD OF REVIEW</b>

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2012). The court has authority to review Commerce's determination finding that merchandise falls within an antidumping or countervailing duty order. 19 U.S.C. § 1516a(a)(2)(B)(vi). The determination will be upheld unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i). A remand redetermination is "also reviewed for compliance with the court's remand order." Xinjiamei Furniture (Zhangzhou) Co. v. United States, 968 F. Supp. 2d 1255, 1259 (CIT 2014) (internal quotation and citation omitted).

 "Scope orders may be interpreted as including subject merchandise only if they contain language that specifically includes the subject merchandise or may be reasonably interpreted to include it." Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1089 (Fed. Cir. 2002). Although Commerce has the authority to clarify an order's scope, it cannot interpret an order "in a way

contrary to its terms." <u>Whirlpool Co. v. United States</u>, 890 F.3d 1302, 1308 (Fed. Cir. 2018)

(internal quotation and citation omitted).

## DISCUSSION

Commerce is required to use the (k)(1) sources to ascertain the meaning of ambiguous

language in scope orders. <u>See</u> 19 C.F.R. § 351.225(k)(1). These sources are particularly useful in

contexts where the language of the orders may have a specific meaning based on the context in

which it was used during the underlying investigation. <u>See</u> <u>Fedmet Res. Corp. v. United States</u>,

755 F.3d 912, 921 (Fed. Cir. 2014) ("[T]he reason why the (k)(1) sources are afforded primacy

in the scope analysis is because interpretation of the language used in the orders must be based

on the meaning given to that language during the underlying investigations."). Thus, on second

remand, Commerce considered the (k)(1) sources to assess the reasoning behind the ASTM A-

335 exclusion to see if that reasoning applied to AEC's pipe. Commerce also examined the (k)(1)

sources to ascertain the intended meaning behind the term "commodity," which was used

sporadically during the investigation, to determine whether it revealed an intention to exclude

specialty pipe (like AEC's) from the Orders.  After finding that AEC's pipe fell within the scope

of the Orders, Commerce also instructed CBP to continue to suspend liquidation of entries of

AEC's pipe. CBP Messages 8110301 & 8110302 re: "Scope Determination on

Countervailing/Antidumping Duty Order on Specialized Seamless Pipe (AEC Pipe) from the

People's Republic of China (China) (C-570-957; A-570-956)," (Apr. 20, 2018) <u>available at</u>

https://aceservices.cbp.dhs.gov/adcvdweb/#messageDetails (last visited Nov. 20, 2020) (enter

"8110301" and "8110302" into search bar in top left corner; click "Search;" click on "8110301"

or "8110302" in the results to access Message Body) ("Instructions to CBP").

  **I.      Inclusion of AEC Pipe in the Scope of the Orders**

Commerce focused its review of the (k)(1) sources on three questions: (1) what standard,

line and pressure ("SLP") applications or end-uses were covered by the Orders, (2) how was the

term "commodity" used in the sources, and (3) what reasons motivated Commerce's exclusion of

ASTM A-335 pipe from the scope of the Orders, based on instructions provided by the court

when the case was remanded. See Def.'s Resp. to the Parties' Cmts. On the Dep't of

Commerce's Final Results of Redetermination, ECF No. 63, at 7 (Sept. 17, 2020) ("Gov. Br.");

Second Remand Results at 24–34; see also Second Remand Order, at *5–7.

### A.  Standard Application of Pipe as Referenced in Petition and ITC Proceedings

For the first question, Commerce looked to the language of the Petition and subsequent

supplements, as well as language from the ITC proceedings to find that the Petitioners did not

intend to exclude pipes designed for non-industrial purposes. See Second Remand Results at 24.

In reviewing the Petition, Commerce noted that only line and pressure applications are described

in industrial terms, whereas the standard application for pipe is defined as "conveyance of water,

steam, natural gas, air, and other liquids and gasses in plumbing and heating systems, air

conditioning units, automatic sprinkler systems, and other related uses." U.S. Steel Corp.,

"Petition for the Imposition of Antidumping and Countervailing Duties," A-570-956 and C-570-

957, ECF No. 65, P.R. 1-4, C.R. 1-4, Exhibit L at 5, J.A. 246 (Sep. 16, 2009) ("Petition").

Commerce observed that some of these uses and systems (e.g., air conditioning units, sprinkler

systems, plumbing and heating systems) are common in non-industrial settings and support an

inference that the standard application pipe described in the (k)(1) sources was meant to cover

residential uses. See Second Remand Results at 8.

As part of its analysis of the (k)(1) sources, Commerce also reviewed its own

recommendation to edit and then remove end-use language from the Orders by examining the

Petition and subsequent supplements, and found that the Petitioners did not originally include

end-use language as a way of limiting the scope to particular industries, but rather because they

were concerned that Chinese producers would circumvent the Orders simply by altering their

pipe's specifications. See id. at 9–11; see also U.S. Steel Corp., "Amendment to the Petition for

the Imposition of Antidumping and Countervailing Duties," A-570-956 and C-570-957, ECF No.

65-1, P.R.R. 7-12, Exhibit 3 at 6–7, J.A. 97–98  (Sep. 25, 2009) ("First Supplement"); U.S. Steel

Corp., "Amendment to the Petition for the Imposition of Antidumping and Countervailing

Duties," A-570-956 and C-570-957, ECF No. 65-1, P.R.R. 7-12, Exhibit 5 at 2–3, J.A. 133–34

(Sep. 29, 2009) ("Second Supplement"). Petitioners accepted Commerce's suggestion to remove

end-use language from the scope because they were convinced that the scope as written would

sufficiently address this concern. See Second Remand Results at 11.

     In reviewing the ITC documents as part of its analysis of (k)(1) sources, Commerce also

observed that the ITC had a broad view of the industries covered by the Orders because the ITC

noted that seamless SLP pipe is used "in mechanical applications for general construction."

Second Remand Results at 20; Certain Seamless Carbon and Alloy Steel Standard, Line, and

Pressure Pipe from China (Preliminary), USITC Pub. 4106, Investig. Nos. 701-TA-469, 731-TA-

1168, at 6 (Nov. 2009) ("ITC Preliminary Report"); Certain Seamless Carbon and Alloy Steel

Standard, Line, and Pressure Pipe from China Prehearing Report to the Commission (Final),

Investig. Nos. 701-TA-469, 731-TA-1168 at II-1, II-10 (Aug. 30, 2010) ("ITC Prehearing

Report"). Commerce inferred that general construction includes more than just industrial or

commercial piping systems uses. See Second Remand Results at 21. Finally, Commerce noted,

however, that AEC's pipe is used in various industrial settings based on AEC's description of the

pipe's uses in "Gate Station fabrications," "meter sets by the natural gas industry" and "dairy,

food, agriculture, medical, and aerospace industries." See Second Remand Results at 26; AEC

Scope Request at 3.

AEC contends that its pipe is not used in "general construction" but rather serves "a niche

market that requires malleable pipes that…bend without cracking or splitting in tight spaces,

whether in residential or other settings." AEC Br. at 21. In fact, AEC claims that its argument

was never about whether the (k)(1) sources reveal that the Orders cover commercial or

residential end users, but rather contends that its pipe's application was non-standard in nature

because it served a niche market seeking malleable pipe. Id. at 21–22. Thus, it argues that its

pipe is not interchangeable with standard pipe. Id. at 21. Commerce observed that flexibility and

malleability were never discussed in the (k)(1) sources or in the scope language as relevant

characteristics for determining whether pipe is excluded from the Orders. Second Remand

Results at 26, 38. Thus, flexibility and malleability alone are likely insufficient to establish that

AEC's pipe falls outside the scope of the Orders.

Commerce's inference that the scope language covers non-industrial settings drawn from

the general description of standard pipe, including its use in "air conditioning units" and

"plumbing and heating systems," is reasonable as these systems and units are found in non-

industrial settings. Second Remand Results at 8. Commerce's understanding is further supported

by ITC's discussion of "general construction," which can reasonably be interpreted to include

both residential and industrial settings. See ITC Preliminary Report at 6; see also ITC Prehearing

Report at II-1, II-10; Second Remand Results at 20–21.

*B.  The Term "Commodity"*

AEC contends that an analysis of the (k)(1) sources reveals that the Orders were meant to

cover "commodity" pipe and exclude specialized pipe. AEC argues that "commodity" is

consistently used "to broadly distinguish 'standard' or 'ordinary' from custom or specialized

pipe." AEC Br. at 17. Specifically, AEC argues that a review of the use of the term "commodity"

in the (k)(1) sources reveals that the Petitioners were concerned with standard, "off the shelf"

pipe, and not with specialized pipe for niche markets. See AEC Br. at 16–19. AEC contends its

pipe's "tight tolerances and chemical specifications" render it materially different from the pipe

covered by the Orders, making it "much more malleable, smoother, less subject to rust and

corrosion, and more precise in its dimensions" and that it should thus be excluded as specialized

pipe. See AEC Br. at 14; AEC Scope Request at 5–8, Exhibit B, Exhibit C (comparing AEC pipe

specifications to subject pipe).

Commerce, in its administrative review, determined that Petitioners did not intend to use

the term "commodity" to define the scope of the Orders and exclude certain specialized pipes.

Commerce identified inconsistent uses of the term "commodity" throughout the investigation,

suggesting that the term did not have a clear meaning and was not meant to create a general

exclusion for specialized pipe. Commerce found that "commodity" was used in two ways: (1) to

distinguish "mechanical tubing," an explicitly excluded product, from covered pipes, and (2) to

describe a subsection of explicitly included pipes, quad-stenciled pipes. Second Remand Results

at 24. The (k)(1) sources describe differences between mechanical tubing and "commodity" pipe

such as custom sizing, more exacting requirements, and lower prices. See Certain Seamless

Carbon and Alloy Steel Standard, Line, and Pressure Pipe From China: Hearings Before the

United States International Trade Commission, ECF No. 65-1, P.R.R. 7-12, Exhibit 36 at 68, J.A.

1392 (Sept. 14, 2010) (testimony of George Thompson); U.S. Department of Commerce,

Memorandum from Analyst to File re: "U.S. Customs and Border Protection's Inquiry Regarding

Mechanical Tubing," ECF No. 65, P.R. 1-4, C.R. 1-4, Exhibit J at 1, J.A. 240 (June 24, 2010)

("DOC CBP Memo").[3]

 "Commodity" is also used in a Preliminary Conference before the ITC by counsel for one

of the Petitioners to describe quad-stenciled pipe, which is pipe stenciled to four specifications:

ASTM A-106, ASTM A-53, API 5L-B, and AP15L-X42. See Certain Seamless Carbon and

Alloy Steel Standard, Line, and Pressure Pipe from China: Preliminary Conference Before the

United States International Trade Commission, ECF No. 65-1, P.R.R. 7-12, Exhibit 23 at 113,

J.A. 444 (Oct. 7, 2009) ("ITC Preliminary Conference") (testimony of Roger Schagrin); see also

Second Remand Results at 18. Commerce noted that the Petition explicitly included pipe that is

stenciled to specifications outside of these four specifications. See Petition at 5–6. On remand,

Commerce determined that "commodity" is used in this context to refer to the "predominant (but

not sole) focus of the petitioners' concern," because if the Orders were only meant to cover

quad-stenciled pipe as "commodity" pipe, as implied by counsel's use of the term in the ITC

Preliminary Conference, see ITC Preliminary Conference at 113, the scope of the Orders would

be severely narrowed. Second Remand Results at 18–19; see also Petition at 5–6.

 Commerce observed that mechanical tubing is distinguished from "commodity" pipe in

the (k)(1) sources through its non-standard sizing individually customized for each customer,

Second Remand Results at 23–24, and while AEC's pipe may be specialized,[4] it is not

customized prior to importation. Second Remand Results at 30.

---

[3] See DOC CBP Memo ("Generally, the seamless standard, line and pressure pipes are
commodity products made to standard pipe sizes (outside diameters and wall thicknesses)
whereas mechanical tubing is custom designed to meet a customer's needs and is generally not
produced with the standard pipe diameters and wall thicknesses found in seamless standard, line,
and pressure pipes.").

[4] AEC points to its pipe's flexibility, unique end use, and niche market to argue that its pipe
belongs in the specialized pipe category. See AEC Br. at 17–18.

Commerce's determination that "commodity" is used in different contexts to mean slightly different things, but not to generally exclude all specialized pipe, is also supported by a letter of record. In a letter from Salem Steel advocating for an exclusion from the scope for aviation, hydraulic and bearing tubing, Salem Steel pointed out that these tubes should be excluded because they were "types of mechanical tubing and because they [were] not commodity products." Letter from Dorsey & Whitney LLP to the Sec'y of Commerce on behalf of Salem Steel re: "Response to Commerce Department's June 23 Proposal to Change Scope Language to Exclude Mechanical Tubing," A-570-956, ECF No. 65, P.R.R. 1-4, Attachment 3 at 2, J.A. 331 (June 30, 2010) ("Letter from Salem Steel"). This phrasing could suggest that producers thought of mechanical tubing as one category for exclusion under the Orders and "non-commodity" pipe as a separate category for exclusion. Throughout the rest of the letter, however, the writers conflate the two categories, classifying Salem Steel's pipe as specialized mechanical tubing, and describing how unlike seamless pipe (a "commodity" product), "mechanical tubing is a made-to-order product made according to strict engineering specifications for specific end uses, but with tight physical characteristics specified by the end-user." Id. at 2–5. Other (k)(1) sources follow a similar pattern and support Commerce's finding that "commodity" is primarily used to differentiate mechanical tubing, an explicitly excluded category, from covered pipe. "Commodity" is used to describe how "mechanical tubing" is different from subject pipe because it is not made to standard sizes, meets stronger engineering specifications, and is customized to a specific customer's needs. See Letter from Salem Steel at 2–4, 6; DOC CBP Memo; Letter from Steptoe & Johnson LLP to the Sec'y of Commerce on behalf of MC Tubular Products, Inc. re: "Comments on the Department's June 23, 2010 Proposed Scope Modification," A-570-956, ECF No. 65-1, P.R.R. 7-12, Exhibit 18 at 4–5, J.A. 264 (June 30, 2010) ("Letter

from MC Tubular"). This distinction ultimately became an explicit exclusion within the Orders, suggesting that any "non-commodity" pipe that was being referenced in these documents was limited to mechanical tubing. See ADD Order 75 Fed. Reg. at 69,053; CVD Order, 75 Fed. Reg. at 69,051 ("Also excluded from the scope of the order are all mechanical, boiler, condenser and heat exchange tubing…").

Accordingly, Commerce's determination that "commodity" as used in the (k)(1) sources was not meant to create a broad exclusion from the Orders for specialized pipe is supported by substantial evidence and is in accordance with law.[5]

### C. A-335 Exclusion

The court ordered Commerce to consider if the reasons behind the A-335 pipe exclusion apply equally to AEC's pipe such that AEC's pipe should be excluded from the Orders. See Second Remand Order at *5. During the investigation, language was added to the Orders to explicitly exclude A-335 pipe after a request was made by Wyman-Gordon, a U.S. manufacturer of A-335 pipe. Letter from Wyman-Gordon Forgings Inc. to U.S. Dep't of Commerce re: "Certain Seamless Steel Pipe from China," A-570-956, ECF No. 65-1, P.R.R. 7-12, Exhibit 8 at

---

[5] AEC notes that the Petition does not name AEC as a producer, importer, or seller of subject merchandise or in any other capacity. See Petition at 5–6, Exhibit I-11, Exhibit I-14; see also AEC Scope Request at 10–11. AEC argues that this demonstrates that "Petitioners did not view AEC as a market competitor, or AEC Pipe as subject merchandise." See AEC Br. at 9. As further support for the argument that the domestic industry has no interest in AEC's pipe and does not consider it to be covered by the Orders, AEC also highlights the fact that Petitioners have not opposed AEC's motion or participated in AEC's scope inquiry. See AEC Br. at 9. In response, Commerce noted that the Petitioners specified that the data in this list "represent the best information reasonably available to Petitioners." Petition at 9–10; See Second Remand Results at 35–36, and further that it cannot make inferences about Petitioners' silence. See Second Remand Results at 36; Gov. Br. at 8 (citing PT Pindo Deli Pulp & Paper Mills v. United States, 825 F. Supp. 2d 1310, 1320 (CIT 2012) (holding that "the failure to name foreign producers, of which Petitioners [were] not aware, does not demonstrate an intent to exclude those producers from the investigation").

2, J.A. 145 (Oct. 27, 2009) ("Letter from Wyman-Gordon"). Commerce contends that no

reasoning was explicitly considered or endorsed by Commerce in the creation of this exclusion

because Petitioners themselves requested that the exclusion be included in the scope language,

see Petitioners' Letter, "Certain Seamless Carbon and Alloy Steel Standard, Line and Pressure

Pipe from the People's Republic of China: Request for Change in Scope Language," ECF No.

65, P.R.R. 1-4, Attachment 4 at 1–2, J.A. 423–24 (July 2, 2010) ("Petitioner's Letter to Exclude

A-335"), and Commerce provided only the Wyman-Gordon letter as justification for this change

in the scope language. See Certain Seamless Carbon and Alloy Steel Standard, Line, and

Pressure Pipe from the People's Republic of China: Preliminary Determination of Sales at Less

Than Fair Value, Affirmative Preliminary Determination of Critical Circumstances, in Part, and

Postponement of Final Determination, 75 Fed. Reg. 22372, 22374–75 (April 28, 2010) ("AD

Preliminary Determination"). AEC points to language in the ITC proceeding and language

provided in Wyman-Gordon's request to illustrate the reasoning behind the A-335 exclusion and

to argue that these reasons apply equally to its pipe. AEC Br. at 7, 10–12. AEC also argues that

the reasoning behind the A-335 exclusion is similar to that which applied to mechanical tubing,

and that its pipe is analogous to both. See id.

    In its letter to Commerce, Wyman-Gordon requested an exclusion for three products,

including A-335 pipe, because "none of the other products covered by the petition are

substitutable for any of the three products." Letter from Wyman Gordon at 2. The Commission

examined the reasoning behind the A-335 exclusion in more detail based on responses from U.S.

producers who highlighted "differences in the customer base and in pricing practices," and that

A-335 pipe is "higher priced than other forms of seamless SLP pipe." ITC Prehearing Report at

I-28, I-30. It also noted A-335's high temperature applications (as compared to the lower

temperature applications of subject pipe), which require different heat treatments and different chemistry. See id. at I-26–I-27. The ITC cited reports of lack of interchangeability between seamless pipe and A-335 pipe and noted that while A-335 pipe can be used in certain applications, specifically pressure applications appropriate for X[6] standard pipe, such "substitution was not deemed economical and was not possible in reverse." Id. at I-28.

Commerce interprets the X standard pipe explanation to mean that Petitioners expected pipe that fell into the A-335 exclusion to at least meet the specifications for X standard pipe, a standard that AEC's pipe does not meet. Second Remand Results at 29–30. AEC argues that Commerce's interpretation cannot be clearly inferred from the ITC report and that the purpose of this section was to highlight the lack of interchangeability between the A-335 pipe and the subject pipe, rather than to establish a clear standard that must be met. See AEC Br. at 20. AEC contends that its pipe is not interchangeable with standard pipe because of its flexibility and ability to deliver gas in tight spaces and notes that its pipe is priced higher than seamless SLP pipe. See AEC Br. at 14, 26; AEC Scope Request at 5–8. AEC also pointed to its custom stencil: [[                                                                    ]] to suggest that its pipe is not a "comparable specification" under the Orders but is instead a superior pipe. See AEC Scope Request at Exhibit C. Finally, AEC claims that it has been unable to domestically source its pipe. See id. at 8–10 (citing exhibits comparing its product to domestically available pipe). Thus, AEC concludes that its pipe is specialized and analogous to Wyman Gordon's pipe and should be excluded from the scope of the Orders. See AEC Br. at 11–13, 22–24.

---

[6] In this opinion, X standard pipe will be used refer to an exact pipe specification for the purposes of protecting confidential information. [[                                        ]].

*Confidential Information Omitted*

Commerce appropriately examined each of the (k)(1) sources and determined that the

reasoning behind the A-335 exclusion was not elucidated by the Petitioners or accepted by

Commerce when Commerce created the A-335 exclusion, as evidenced by Commerce's stated

reasoning for editing the scope language. See Letter from Wyman Gordon at 1–2; Petitioner's

Letter to Exclude A-335 at 1; AD Preliminary Determination at 22374–75. Commerce has now

addressed AEC's claims by reviewing the (k)(1) sources and determining that the A-335

exclusion was granted because A-335 pipe is "superior" to seamless SLP pipe and that this

superiority requires meeting at least the standard of X standard pipe. See Second Remand

Results at 38–39. The ITC specifically noted that A-335 pipe can be stenciled to meet the X

standard pipe specifications but that this substitution would be costly and impractical. ITC

Prehearing Report at I-28. Commerce found an important distinction between AEC's pipe and A-

335 pipe by pointing out that AEC's pipe can be stenciled to meet the requirements of [[

            ]] and, unlike A-335 pipe, cannot meet the requirements of X standard pipe. See

Second Remand Results at 38–39.[7]

Commerce's conclusion in the Second Remand Results that the A-335 exclusion was

meant to be narrow is also supported by Commerce's choice to modify the final scope language

to exclude only A-335 pipe. See Second Remand Results at 12. It did not use other language

proposed by Petitioners or further exclusions proposed by Wyman Gordon in its letter to

Commerce. Compare Petitioner's Letter to Exclude A-335 at 2, and Letter from Wyman Gordon

at 1–2, with ADD Order 75 Fed. Reg. at 69,053 and CVD Order, 75 Fed. Reg. at 69,051 ("all

---

[7] While AEC's more generalized view of the ITC documents is another possible reading, this
does not in and of itself mean that Commerce's findings are unsupported by substantial evidence.
See Viet I–Mei Frozen Foods Co. v. United States, 839 F.3d 1099, 1106 (Fed. Cir. 2016) (noting
that the possibility of drawing multiple conclusions from the same evidence does not preclude
Commerce's determinations from being unsupported by substantial evidence).

*Confidential Information Omitted*

pipes meeting the chemical requirements of ASTM A-335"). Wyman-Gordon's request was

based on the specialized nature of the three pipe products it produces. See Letter from Wyman-

Gordon at 2 (emphasizing that "none of the other products covered by the petition are

substitutable for any of the three products described above for which we believe we are the only

US manufacturer"). Despite this alleged specialization, Commerce only excluded A-335 from

the final scope, supporting Commerce's determination that the A-335 exclusion is narrow.

Thus, based on: (1) Commerce's interpretation of the ITC investigation to mean that pipe

under the A-335 exclusion must meet at least the requirements of X standard pipe, and (2)

Commerce's limited modification of the scope language to exclude A-335 pipe and not other

products referred to by Petitioners and Wyman Gordon, Commerce's determination that AEC's

pipe is included despite the A-335 exclusion is supported by substantial evidence and is in

accordance with law.

### D.   Conclusion

Upon review of the (k)(1) sources, Commerce has provided substantial evidence that

AEC's pipe falls within the scope of the Orders. The court directed Commerce to examine the

(k)(1) sources as required by law to understand the meaning of the Orders and, if the (k)(1)

sources were not dispositive, to move on to the (k)(2) factors. See Second Remand Order at *7.

Here, Commerce has sufficiently analyzed the (k)(1) sources to determine that AEC's pipe falls

within the scope of the Orders and is not subject to any exclusion. The (k)(1) sources are

dispositive and Commerce's determination is supported by substantial evidence and is in

accordance with the law.

## II.   Retroactive Assessment of Duties

*Confidential Information Omitted*

On April 20, 2018, after determining that AEC's pipe fell within the scope of the Orders,

Commerce instructed CBP to "continue to suspend liquidation of entries of certain seamless

carbon and alloy steel, line and pressure pipe from China, including AEC's AEC Pipe."

Instructions to CBP. AEC contends that it would be "fundamentally unfair" to retroactively

apply ADD/CVD duties to its product because the plain language of the ADD/CVD Orders did

not unambiguously include AEC's pipe, and important records from the scope history that

Commerce relied upon in making its scope ruling regarding AEC's pipe were not "readily

accessible," as they were available in print and not in Commerce's online document repository,

ACCESS. AEC Br. at 30.

    AEC argues that the facts in this case are most similar to those in United Steel &

Fasteners, Inc. v. United States, 947 F.3d 794 (Fed. Cir. 2020). AEC argues that in United Steel,

the U.S. Court of Appeals for the Federal Circuit ("CAFC") found that there was a genuine issue

as to whether the product was in scope and that the importer had relied on the government's

failure to charge ADD/CVD duties, therefore "it was unlawful for Commerce to assess ADD

liability from the issuance date of the ADD order" but rather, pursuant to 19 C.F.R. §

351.225(l)(3), "Commerce may suspend liquidation beginning 'on or after the date of initiation

of the scope inquiry.'" See AEC Br. at 28–29 (citing United Steel, 947 F.3d at 801). Similarly,

AEC argues that it was not on notice that its pipe might be subject to the Orders because it was

not named in the Petition, see Petition at Exhibit I-11, was not invited to participate in the

investigations that resulted in the Orders, and it had imported its pipe for years without paying

ADD/CVD duties. AEC Br. at 29. In addition, AEC argues that the court has already decided

that a portion of the Orders are "facially ambiguous" by deciding that the aerospace exclusion

was unclear without reviewing the (k)(1) sources. AEC Br. at 29 (citing <u>First Remand Order</u>, 399

F. Supp. 3d at 1321–23).

     In response, the Government argues that the Orders are not ambiguous, that AEC's pipe

clearly falls within the scope, and that the court's remand order requiring a (k)(1) source analysis

does not necessarily imply that the Orders are facially ambiguous. <u>See</u> Gov. Br. at 16 (citing

<u>First Remand Order</u>, 399 F. Supp. 3d at 1320). The Government contends that AEC was on

notice that its product may fall within Commerce and ITC's investigations and had an

opportunity to participate in the process because Commerce published initiation notices and the

resulting Orders in the Federal Register as required by law. <u>See</u> Gov. Br. at 19; <u>Certain Seamless</u>

<u>Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China:</u>

<u>Initiation of Countervailing Duty Investigation</u>, 74 Fed. Reg. 52,945 (Dep't of Commerce Oct.

15, 2009); <u>Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the</u>

<u>People's Republic of China: Initiation of Antidumping Duty Investigation</u>, 74 Fed. Reg. 52,744

(Dep't of Commerce Oct. 14, 2009); CVD Order, 75 Fed. Reg. 69,050; ADD Order, 75 Fed.

Reg. 69,052.  In addition, the Government notes that AEC had access to all (k)(1) sources used

in the scope ruling in paper form through the Department's Central Records Unit, and that

Commerce was under no obligation to publish the documents online. <u>See</u> Gov. Br. at 20; <u>see also</u>

<u>Suntec Indus. Co. v. United States</u>, 857 F.3d 1363, 1369 (Fed. Cir. 2017) ("Like the Court of

International Trade, we conclude that the Federal Register notice did constitute notice as a matter

of law.").

     Finally, the Government points to recent case law from the CAFC which says that it is

proper for Commerce to continue to suspend entries if CBP suspends the entries <u>before</u> the scope

ruling, regardless of whether the orders were ambiguous. First, the Government notes that under

Quiedan Co. v. United States, when the product is "clearly within the language of the ADD

Order, considering the factors specified in § 351.225(k)(1)," and CBP has suspended entries

prior to the scope ruling, Commerce has the authority to continue these suspensions. Gov. Br., at

16, 18 (citing Quiedan Co. v. United States, 927 F.3d 1328, 1333 (Fed. Cir. 2019)). The

Government notes, and AEC does not dispute, that there is no evidence that CBP did not suspend

entries prior to the scope ruling in this case. See Gov. Br., at 18 (citing Second Remand Results

at 46). Second, even if the court found that the Orders were ambiguous as to the inclusion of

AEC's pipe, the Government contends that the CAFC upheld CBP's authority to suspend entries

for ambiguous orders and that Commerce can continue to suspend entries because without this

authority, 19 C.F.R. § 351.225(l) would be unnecessary. See Gov. Br. at 16–17; see also

Sunpreme Inc. v. United States, 946 F.3d 1300, 1317 (Fed. Cir. 2020) (en banc).

Recent en banc precedent from the CAFC establishes that when determining if

ADD/CVD liability attaches for a product subject to a scope ruling, the court's key consideration

must be the timing of suspension of entries of the product by CBP. If CBP decides that a product

falls within the scope of ADD/CVD orders and begins suspending entries prior to the scope

ruling, and Commerce later determines in a scope ruling that the product is within the scope of

the Orders, then Commerce by regulation is to instruct CBP to continue to suspend liquidation.

See Sunpreme Inc., 946 F.3d at 1319 (holding that where "a suspension that predates the scope

inquiry already exists, subsection… [19 C.F.R. § 351.225](l)(3) …dictates that the existing

suspension 'will continue.' …[and] [n]o retroactivity concerns are raised because no new

suspension occurs.").[8] This holds true even if the court deems the Orders ambiguous. See id. at

1321 (holding that "Customs has the authority to suspend liquidation of goods when it

determines that the goods fall within the scope of an ambiguous antidumping or countervailing

duty order."). The CAFC noted that this interpretation of the statute and applicable regulation

removes perverse incentives that might lead companies to submit unmeritorious scope ruling

requests to Commerce in a delayed manner to expand the window between when CBP begins

suspending liquidation of entries and when Commerce issues its scope ruling on the product. See

Sunpreme Inc., 946 F.3d at 1319–22.[9]

Whether or not the Order at issue can be labeled ambiguous in the abstract, United Steel,

to the extent it is not limited by Sunpreme, is not dispositive. In that case, CBP had not

suspended entries prior to Commerce's scope ruling on the Plaintiff's product. See United Steel,

947 F.3d at 797–798. Accordingly, the court in United Steel found that Commerce could not

---

[8] See 19 C.F.R. § 351.225(l)(3) ("If the Secretary issues a final scope ruling, under either paragraph (d) or (f)(4) of this section, to the effect that the product in question is included within the scope of the order, any suspension of liquidation under paragraph (l)(1) or (l)(2) of this section will continue. Where there has been no suspension of liquidation, the Secretary will instruct the Customs Service to suspend liquidation and to require a cash deposit of estimated duties, at the applicable rate, for each unliquidated entry of the product entered, or withdrawn from warehouse, for consumption on or after the date of initiation of the scope inquiry. If the Secretary's final scope ruling is to the effect that the product in question is not included within the scope of the order, the Secretary will order any suspension of liquidation on the subject product ended and will instruct the Customs Service to refund any cash deposits or release any bonds relating to this product.").

[9] The government argues that the approximate one-year delay between when AEC received a Notice of Action from CBP and when AEC requested a scope ruling from Commerce, could be evidence of this circumvention tactic. See Gov. Br., at 18–19. The court need not resolve any issue as to AEC's intent.

instruct CBP to retroactively begin suspension of entries from the date of issuance of the ADD

order. Id. at 802–03.[10]

As previously discussed, later cases solidified the importance under the applicable

regulation of CBP's timing in initially suspending entries prior to Commerce's scope ruling. See

Sunpreme Inc., 946 F.3d at 1319 (noting that there is "nothing 'retroactive' about continuing to

suspend liquidation where liquidation has already been suspended for the entire relevant time

period."); Quiedan, 927 F.3d at 1333 (noting that "that continued suspension of liquidation is

proper, at least where the scope ruling confirms a clear meaning"). The Government also argues

that AEC admits it was on notice that its pipe might be subject to the Orders prior to

Commerce's issuance of its scope ruling because of CBP's Notice of Action. See Second

Remand Results at 46; AEC Br. at 29. Although AEC argues that it did not expect to have to

participate in the initial ADD/CVD investigation, and that gaining access to the (k)(1) sources

was logistically challenging, see AEC Br. 29–30, it has not proffered evidence to contest the

timing of CBP's suspension of entries. It appears that here, CBP suspended entries prior to the

initiation of the scope proceeding. Given CBP's action, and that Commerce's scope ruling that

AEC's pipe is within the scope of the Orders is supported by substantial evidence and is in

accordance with law, an instruction to CBP to "continue to suspend liquidation of entries of

certain seamless carbon and alloy steel, line and pressure pipe from China, including AEC's

AEC Pipe," is proper and in accordance with law. Instructions to CBP.

---

[10] Commerce has proposed new regulations in response to recent CAFC decisions on this issue
including United Steel and Sunpreme. See Regulations to Improve Administration and
Enforcement of Antidumping and Countervailing Duty Laws, 85 Fed. Reg. 49,472, 49,476,
49,483, 49,498 (Aug. 13, 2020) (summarizing Sunpreme, United Steel, and other cases that
affirm Commerce's power to order CBP to continue to suspend liquidation of entries in some
contexts). Nothing in Commerce's explanation of the case law in this proposed regulation
contradicts the court's view of current law applicable to this case.

## CONCLUSION

For the foregoing reasons, the court sustains Commerce's determination in the Second

Remand Results that AEC's pipe falls within the scope of the Orders and finds no error in an

instruction to CBP to continue to suspend liquidation of entries of AEC's pipe.


                                                        /s/Jane A. Restani
                                                    Jane A. Restani, Judge


Dated: November 27, 2020
          New York, New York